

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  | § |  |
| --- | --- | --- |
| ROYCE JACKMAN, | | No. 08-14-00176-CR |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | 168th District Court |
| | § | |
| THE STATE OF TEXAS, | | of El Paso County, Texas |
| | § | |
| Appellee. | | (TC # 20120D01661) |
| | § | |

**O P I N I O N**

Royce Jackman was originally indicted for capital murder on March 28, 2012. The State later chose not to seek the death penalty and a jury found Appellant guilty of the lesser-included offense of murder, sentencing him to 40 years in the Institutional Division of the Texas Department of Criminal Justice. The trial court sentenced Appellant in accordance with the jury's verdict. Appellant now raises four issues on appeal: three challenging the sufficiency of the evidence and one alleging charge error. For the reasons that follow, we affirm the judgment.

**FACTUAL SUMMARY**

The parties' versions of events differ drastically as to whether Appellant was required to act in self-defense or whether he acted as the first aggressor.

Richard Renfro Jones met the victim, Clifton Baker, at one of El Paso's homeless shelters, the Opportunity Center. Jones struggled with a crack-cocaine addiction. He was good

friends with Baker for approximately two years before Baker's death. Jones met Appellant at the Opportunity Center about one week before Baker's death.

On the evening of January 5, 2012, Jones met Baker for drinks at Sonny's Bar. Baker's toxicology report revealed that he was legally intoxicated with a blood alcohol level of .092. At some point later in the evening, Baker and Jones obtained crack cocaine and walked to the corner of Texas and Noble Streets. Both men referred to this corner as "their office" because it was where they went to "take care of business," or in other words, to drink and get high. Baker's autopsy report similarly indicated that he had consumed an amount of cocaine a few hours before his death that would likely have caused him to feel a high. Three other men joined Baker and Jones. Approximately thirty minutes later, Appellant joined the group and asked for a cigarette. The men agreed that they wanted more cocaine and Baker mentioned that he had seven dollars to contribute toward the next purchase. Appellant then asked Baker if he could use his cellphone and Baker lent it to him. Appellant walked away with Baker's phone, turned the corner to walk toward the front of an apartment building, and left the group of men by the dumpsters on the side of the building. Baker followed Appellant, and Jones trailed closely behind. Baker was able to catch up and asked for his phone back. According to Jones, Baker was not angry or aggressive, but was just trying to retrieve his phone. When Baker asked for his phone, Appellant responded, "[l]et me see that $7." When Baker refused, Appellant repeated, "[l]et me see that $7 and I can go get the rest of the money," so they could buy cocaine. Again, Baker refused and reiterated that all he wanted was his phone. Appellant answered, "you think I give a f**k about this phone"? Baker attempted to reach for his phone, but Appellant struck him.

Baker tried to defend himself and the two men engaged in a struggle until Appellant tossed Baker to the ground. After witnessing Appellant throw Baker to the ground, Jones walked

2

away from the scuffle, back towards the office because he did not want to get involved with the police and assumed that someone from the apartment building would attempt to break up the fight. But after Jones heard more hitting, he headed back toward the fight and saw Baker on the ground with a knife in his hand and Appellant circling him.[1] Jones testified that Appellant would not let Baker get up. Appellant told Baker several times to drop his knife and when Baker refused to do so, Appellant kicked him in the face, causing Baker to fall backwards toward the building, dropping his knife. Jones decided to walk away again, thinking someone from the apartment building would come outside.

Approximately five minutes later, while at the office, Jones heard Baker say, "That's it. I'm done." Hearing this, Jones walked back to the fight scene and saw Baker still lying on the ground and Appellant was tapping him on the chest. Jones demonstrated for the jury exactly how Appellant tapped Baker. He then heard Appellant say, "who got it now"? Jones was unsure if Appellant was referring to Baker's money or his phone.

Jones then walked westward toward downtown El Paso, still on Texas Street, when he came across Appellant, who walked up to him with the knife still in his hand. Jones asked Appellant what he had done, and according to Jones, Appellant grunted. Appellant then began walking ahead of Jones, at which point the police arrived and told them to freeze and get down on the ground. Jones complied, and the police took him into custody for questioning. The police questioned, searched, swabbed, and fingerprinted Jones, but they ultimately did not charge him with any crime. The police found one folded pocket knife and one folded silver multi-tool on Jones when questioning him. Jones testified that he did not handle the knife that killed Baker. Jones positively identified Appellant in court. On cross-examination, Jones admitted that he told

---

[1] Jones testified that he did not initially see Baker pull the knife. When Jones returned to the fight scene, Baker already had his knife out and was lying on the ground.

3

an investigator from the Public Defender's office that he actually did not see Appellant hit Baker first. He also did not remember saying, as his statement to the police indicates, that Baker's money was in Appellant's pocket. On re-direct, Jones clarified that to his knowledge, the money remained in Baker's pockets when the fight started, and he never saw, or claimed to see, Appellant with the money. Francisco and Victoria Elias lived in one of the ground-floor apartments on Texas Street. They stayed up past midnight watching television on January 5, 2012, and heard fighting outside their apartment window. Victoria testified that they were used to fights near their apartment, but she and her husband were frightened that evening because they heard continuous blows to the apartment wall. Francisco got up to look out the bedroom window to see what was going on outside. While the window had film and metal meshing, Francisco was still able to see two men fighting, one on top of the other. He heard the man on the bottom saying something like "get off me" while the man on top kept replying, "not until you drop the knife." Francisco immediately called 911. Victoria testified that she thought she heard the man on the bottom yell, "let me go, let me go." While neither Francisco nor Victoria could visually identify the two men, both were able to distinguish their voices. Victoria thought that the person on the bottom, yelling "let me go, let me go," sounded older, around fifty years of age, tired, and hurt, while the man on top sounded like a younger male. Francisco similarly testified that the man on the bottom sounded older and thought that he was Anglo-American and described his tone as scared. Based on the tone of the man on top, Francisco thought he might have been African-American.

Victoria saw the younger male straddling the older male, hitting him with both of his hands, although she was unable to see what, if anything, he had in his hands. He heard the younger male say, "who has the weapon," while Francisco heard him say, "who's got the knife

4

now?" Francisco then saw the younger man walk away with another person, heading toward downtown. Officers arrived almost immediately and told the younger male to drop the weapon. Francisco left his apartment to inform the officers that he was the individual who had dialed 911. On cross-examination, Francisco recalled giving a statement to Officer Baca after the altercation. Francisco told Baca that he could see that the man on the bottom had his arms pinned down. The man on top kept saying, "drop the knife," but the man on the bottom said, "let me go first." Francisco's statement also revealed that he heard the man on the bottom yelling, "who's got the shiv, man." Based on his observation, he thought that the man on the bottom still had the knife. Francisco admitted that he did not inform the officers that he thought the man on the bottom was Anglo, but that he presumed so based on the tone of his voice and his actions because he could not see clearly outside his window.

On January 5, 2012, Officer Jorge Ruelas was on patrol duty in downtown El Paso when a call came in over his radio regarding a subject with a knife. Ruelas arrived at the scene about a minute later and observed two males walking westbound on Texas Street. He immediately instructed the men to stop. He observed an African-American male, later identified as Appellant, wearing blue jeans and a grey, black, and white flannel shirt with a red substance on it, later identified to be blood, standing closest to the apartment building. The second African-American male, later identified as Jones, was wearing glasses, a gray shirt or sweater, and blue jeans. After noticing the red substance on Appellant's flannel shirt, Ruelas became suspicious and asked the men to show him their hands. Ruelas saw that Jones had nothing in his hands, but could see a shiny object in Appellant's right hand. He immediately drew his weapon and told the two men to get down on the ground and drop the knife. Jones complied, but Appellant did not comply

5

until Ruelas repeated his command and two other officers arrived at the scene. Appellant then threw the knife behind him and got on the ground.

Officer Kristopher Serna approached Appellant to handcuff him and noticed that his left hand was still clenched in a fist; his hands were bloody and there was blood spatter on the left side of his clothing. Serna instructed Appellant to open his left hand, but Appellant would not comply. When Serna handcuffed Appellant, he was able to pry his left hand open and discovered several blood-stained, crumpled-up dollar bills and coins, which Serna tossed to the side.

About five yards away, Ruelas noticed a man wearing a red jacket, jeans, and white shoes, later identified as Baker, lying on the ground. Ruelas found a folded silver pocket knife next to him. By that time, Officer Guerra had arrived, and he and Ruelas checked on Baker and found he still had a pulse. Ruelas administered CPR until the paramedics arrived. The officers then secured the scene and Ruelas transported Appellant to police headquarters. Appellant remained silent during his arrest. Baker died in the early morning hours of January 6, 2012, from one of several stab wounds.

Officers marked and photographed several pieces of evidence including multiple drops of blood; blood spatter on the wall next to where Baker was found; Baker's partial ear; and a knife with the blade extended. Appellant had several shallow, minor cuts to his hands and scrapes to his knees. Witnesses who testified were unable to conclude whether these cuts and abrasions were defensive or offensive, or precisely how they were sustained.

Baker's jacket and shirt were saturated in blood and had several punctures that matched the stab wounds on his body. A DNA analysis revealed that the blood on the blade of the knife found in Appellant's hand and blood on his left pant leg matched Baker's DNA. Both

6

Appellant's and Baker's DNA were found on the knife handle. Their DNA was also found on Appellant's right hand.

Dr. Juan Contin, El Paso's Chief Medical Examiner, performed the autopsy on Baker and testified regarding the injuries the victim sustained. Baker suffered both blunt- and sharp-force injuries, several bruises and abrasions to the face, an impact-caused lip contusion and laceration, a laceration to the chin, abrasions to the back of the head, and a laceration to his right thigh caused by impact. Baker also had multiple scratches and what Dr. Contin described as burns to the backs of his hands and fingers as a result of rubbing against the ground or a similar rough surface, as well as a linear abrasion caused by an object, possibly a knife. Baker sustained a total of six stab wounds: two superficial stab wounds to his abdomen, two superficial stab wounds to the left side of his neck and top of his left shoulder, and two more to his upper chest, one of which caused him to bleed to death. Dr. Contin pointed out that a substantial portion of Baker's ear appeared to have been cut off with a knife.

Dr. Contin further testified that the injuries Baker sustained to his chest, including the fatal stab wound, were consistent with being stabbed by a knife or a similar knife-like object; that a knife was a deadly-weapon; and that nothing could have been done to save Baker's life.

Appellant testified at the guilt-innocence phase of his trial. He was drinking at the Tap Bar on the evening of January 5, 2012. Appellant left along with another man and walked to a gas station near the freeway to purchase more beer. From there, the two men went to Sonny's Bar but it was closed. Upon leaving Sonny's Bar, Appellant stopped to use a nearby pay phone because his own cell phone was dead and he wanted to buy some drugs. The pay phone was located on the corner next to the Opportunity Center, about one block away from the office. The person Appellant called told him to meet him at the office so he and the other man walked over

7

there. When asked why Appellant was still with this other man, Appellant testified that he had been buying the man beer, and the man told Appellant that he would return the favor. Just before arriving at the office, Appellant obtained the crack cocaine and consumed it all himself.

Appellant was standing in the street by himself and noticed three other men standing catty-corner to him against the wall at the office. As soon as Appellant finished smoking the crack cocaine, Baker approached him. Appellant had only seen Baker on a few occasions but had not formally met him. Baker asked Appellant if he could buy him some drugs. Appellant replied that he would, so Baker gave Appellant seven or eight dollars. Appellant then asked Baker if he could use his cell phone to make the drug call and Baker gave him his phone. However, Baker's cell phone ran out of money during the call so Appellant walked over to one of the other men in the group and asked to use his phone. That man lent Appellant his phone and he was able to make the drug call. After doing so, the man that Appellant was originally with that evening, left. Appellant called him on the borrowed cell phone to try and tell him that he had a ride that was going to pick them up so they did not have to walk. While Appellant was talking on the phone, Baker, Jones, and the third man, who gave Appellant his cellphone, approached Appellant. According to Appellant, when he turned around to face the three men, Baker pulled out a knife. Appellant immediately placed his hands in the air and the third man took his cell phone back. Appellant saw Baker swinging his knife toward him, so he took two steps back and immediately fell down. Appellant tried defending himself with his left leg while he was still lying on the ground and managed to kick Baker which caused him to also fall to the ground. Appellant rolled over and the two men began fighting.

Baker continued to threaten him with his knife. Appellant repeatedly told Baker to drop the knife, but because Baker would not do so, Appellant hit him with his right hand and bit

8

Baker's ear three or four times. Baker immediately dropped his knife. When counsel confronted Appellant with Dr. Contin's opinion that Baker's ear had been cut off with a knife, Appellant replied "[w]ell, that's just not a fact. I had bit Mr. Baker's ear off with my mouth--my teeth." Both men then scrambled to get the knife and Appellant managed to get it first. Appellant was still on his hands and knees, trying to catch his breath, when he turned around and saw Baker pull out another knife from his pocket. Appellant testified that he was afraid for his life and was only taking actions to defend himself. The next thing Appellant remembered was getting up and taking a few steps and then the police arrived.

On cross-examination, Appellant admitted that he stabbed Baker and that no one else was involved in the altercation. He also admitted that Baker gave him the seven or eight dollars up front, but denied that Jones heard him say, "Let me get that $7," after Baker asked for his phone back. Appellant also did not remember saying that he did not care about Baker's phone or what happened to it. Appellant would only admit that he stabbed Baker two or three times and not the six times that Baker's autopsy reflected.

## SUFFICIENCY OF THE EVIDENCE

In his first point of error, Appellant complains that the evidence was legally insufficient to support his murder conviction and the jury's rejection of his self-defense theory. We agree with the State's characterization that Appellant is essentially arguing that because the jury rejected his version of events, the evidence was thus insufficient to convict him of murder as alleged in the indictment. In his second and third points of error, Appellant insists that the evidence was legally and factually insufficient to support the jury's negative finding on his sudden passion argument. Because Appellant's first three issues all involve sufficiency of the evidence challenges, we will address these contentions together.

9

**Standard of Review**

In conducting our legal sufficiency review, we must examine all of the evidence in a light most favorable to the verdict, and determine whether, based on that evidence and reasonable inferences therefrom, any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime as alleged in the application paragraph of the jury charge. *Hooper v. State*, 214 S.W.3d 9, 16 (Tex.Crim.App. 2007), *citing Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979); *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex.Crim.App. 1999), *holding modified by Guidry v. State*, 9 S.W.3d 133 (Tex.Crim.App. 1999). In *Malik v. State*, the Court of Criminal Appeals articulated the modern Texas standard for ascertaining what the "essential elements of the crime" are; they are "the elements of the offense as defined by the hypothetically correct jury charge for the case." 953 S.W.2d 234, 240 (Tex.Crim.App. 1997); *see also Clinton v. State*, 354 S.W.3d 795, 799 (Tex.Crim.App. 2011). A hypothetically correct jury charge is one that at least "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240.

In our analysis, we do not reexamine the evidence and impose our own judgment as to whether the evidence establishes guilt beyond a reasonable doubt, but determine only if the findings by the trier of fact are rational. *See Lyon v. State*, 885 S.W.2d 506, 516-17 (Tex.App.-- El Paso 1994, pet. ref'd). The exclusive judge of the credibility of a witness is the fact finder. *Lancon v. State*, 253 S.W.3d 699, 707 (Tex.Crim.App. 2008). The fact finder also determines the weight that is given to each witness and their testimony, and may choose to believe some testimony and disbelieve other testimony. *Id.* Therefore, we do not assign credibility to

10

witnesses or resolve any conflicts of fact. *Id.*; *Adelman v. State*, 828 S.W.2d 418, 421 (Tex.Crim.App. 1992); *Matson v. State*, 819 S.W.2d 839, 843 (Tex.Crim.App. 1991); *Belton v. State*, 900 S.W.2d 886, 897 (Tex.App.--El Paso 1995, pet. ref'd). We resolve any inconsistencies in the testimony in favor of the verdict rendered. *Lancon*, 253 S.W.3d at 707.

This standard of review applies to both direct and circumstantial evidence cases. *See Powell v. State*, 194 S.W.3d 503, 506 (Tex.Crim.App. 2006); *Garcia v. State*, 871 S.W.2d 279, 280 (Tex.App.--El Paso 1994, no pet.). If we sustain a legal sufficiency challenge, it follows that we must render a judgment of acquittal. *Clewis v. State*, 922 S.W.2d 126, 133 (Tex.Crim.App. 1996), *overruled on other grounds by Brooks v. State*, 323 S.W.3d 893 (Tex.Crim.App. 2010).

We must thus determine, after viewing all the evidence in the light most favorable to the verdict, whether any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and also would have found beyond a reasonable doubt against Appellant on his self-defense theory. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex.Crim.App. 1991), *citing Jackson*, 443 U.S. at 318-19, 99 S.Ct. at 2788-89, *and Butler v. State*, 769 S.W.2d 234 (Tex.Crim.App. 1989).

### The Murder Conviction

To convict Appellant of murder as alleged in the indictment, the jury was required to find that Appellant intentionally or knowingly caused Baker's death. *See* TEX.PEN.CODE ANN. § 19.02(b)(1)(West 2015). Appellant maintains that the evidence is insufficient to convict him of murder simply because he presented a defense at trial. We disagree. A jury is entitled to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial. *Hooper*, 214 S.W.3d at 15; *see also Powell v. State*, 194 S.W.3d 503, 507 (Tex.Crim.App. 2006)(holding "cumulative force" of all circumstantial evidence can be

11

sufficient for jury to find accused guilty beyond a reasonable doubt). Moreover, a jury may infer intent from circumstantial evidence such as a defendant's acts, words, and conduct. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex.Crim.App. 2004). The court in *Tillman v. State*, 426 S.W.3d 836, 842 (Tex.App.--Houston [1st Dist.] 2014, pet. ref'd) held that the evidence was sufficient to support a murder conviction where the totality of the circumstances, including the fact that the defendant struck the victim in the head with a hammer with enough force to fracture his skull, and twice in the chest in the vicinity of the heart allowed the jury to reasonably infer intent to kill. *See also Patrick v. State*, 906 S.W.2d 481, 487 (Tex.Crim.App. 1995)(discussing how intent may also be inferred from the extent of the injuries and the relative size and strength of the parties), *citing Lindsey v. State*, 501 S.W.2d 647, 648 (Tex.Crim.App. 1973), *cert. denied*, 416 U.S. 944, 94 S.Ct. 1953, 40 L.Ed.2d 296 (1974); *Cordova v. State*, 698 S.W.2d 107, 112 (Tex.Crim.App. 1985)(explaining that a "jury may find the specific intent to kill from the circumstances accompanying the use of the weapon").

There is ample evidence in the record, both testimonial and physical, to support Appellant's conviction. The State correctly points out that the requisite intent could be inferred by any rational jury from several items of evidence, including (1) Jones' testimony that Appellant initiated the altercation, threw Baker to the ground and prevented him from getting up; (2) Francisco and Valeria Elias' testimony that a younger, African-American male was on top of an older, Anglo male, yelling, "Who's got the knife [or weapon] now" or "Who got it now" before tapping Baker on the chest; (3) the blood stains at the scene and the autopsy photographs illustrating abrasions on the back of Baker's head; (4) Appellant's testimony that Baker ended up on his back at some point during the altercation, that his head hit the apartment wall building, and that the stabbing occurred close to the ground. Moreover, Appellant was almost

12

immediately apprehended and when placed in handcuffs, officers discovered bloody money still in his hand. Appellant readily testified at trial that he stabbed Baker several times and that only he and Baker were involved in the altercation. Officers also observed blood on his pants, shoes, jeans, and the bottoms of his sleeves and shirt. A DNA analysis concluded that the blood on the blade of the knife found on Appellant and the blood on his left pant leg matched Baker's DNA. Further, the DNA of both Appellant and Baker was also found on the knife handle. Finally, Dr. Contin testified that Baker sustained six stab wounds, one of which caused him to bleed to death. Appellant's own admission, coupled with the evidence above, is sufficient to allow any rational juror to conclude he murdered Baker.

### Self-Defense

Also contained within Appellant's first point of error is the argument that the evidence was insufficient to support the jury's rejection of his theory of self-defense. However, Appellant's presentation of a defense, specifically his own testimony at trial, does not automatically entitle him to an acquittal because as discussed above, the jury is the sole judge of credibility and weight to be given to the testimony. *Richie v. State*, No. 14-12-01027-CR, 2014 WL 2158154, at *5 (Tex.App.--Houston [14th Dist.] May 22, 2014, pet. ref'd)(not designated for publication), *citing Saxton v. State*, 804, S.W.2d 910, 914 (Tex.Crim.App. 1991.

The jury was instructed on the law of self-defense as it applies to a defendant's use of deadly force against another. *See* TEX.PEN.CODE ANN. §§ 9.31, 9.32; A person is justified in using deadly force against another: (1) if he would be justified in using force against the other under section 9.31 of the Texas Penal Code; and (2) when and to the degree he reasonably believes the deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force. *Id.* at §§ 9.32(a)(1), (a)(2)(A). Once a defendant

13

produces some evidence of self-defense, the burden then shifts to the State to disprove the theory of defense. *Saxton*, 804 S.W.2d at 913-14. The State is not required to produce evidence to refute the self-defense claim, but rather, is only required to prove its case beyond a reasonable doubt. *Id.* The jury determines whether a defendant acted in self-defense because it is an issue of fact. *Id.* at 914. If a jury returns a guilty verdict, that verdict is an implicit finding that the jury rejected the defendant's self-defense theory. *Id.* Again, we must presume that the jury resolved all conflicting inferences contained in the record in favor of the verdict reached. *See Richie*, 2014 WL 2158154, at *5, *citing Saxton*, 804 S.W.2d at 914; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex.Crim.App. 2010).

Here, the jury was presented with two opposing versions of events. The jury chose to disbelieve Appellant's version and in doing so, reconciled any inconsistencies in the evidence in favor of the guilty verdict. In fact, much of the same evidence that supports the jury's finding that Appellant was guilty of murder also supports a finding against Appellant on his issue of self-defense. *See Sebring v. State*, No. 14-13-01046-CR, 2015 WL 3917982, at *4 (Tex.App.--Houston [14th Dist.] June 25, 2015, pet. ref'd)(not designated for publication). The jury heard Appellant testify that he stabbed Baker several times because he feared for his life. Appellant's testimony is contradicted by several other pieces of evidence, including (1) Jones' testimony that Appellant was the first aggressor, threw Baker on the ground, stood over him, circled around him, would not let him back up to his feet, and kicked him in the face, which caused Baker to fall back to the ground again; (2) Victoria and Francisco's testimony that Appellant was on top of Baker, and Baker sounded hurt and scared; (3) the testimony of all three witnesses that Appellant said some version of, "who's got it/who's got the weapon/who's got the knife now/who's got the shiv, man;" and (4) Appellant admittedly stabbed Baker a total of six times. Viewing the

14

evidence in the light most favorable to the jury's verdict, we conclude that a rational jury could have rejected Appellant's claim of self-defense. We overrule Issue One.

### Sudden Passion

In his second and third issues for review, Appellant contends that the evidence was also legally and factually insufficient to support the jury's rejection of his sudden-passion claim. A defendant may reduce a murder charge from a first-degree felony to a second-degree felony if he proves by a preponderance of the evidence that he caused the death under the immediate influence of sudden passion arising from an adequate cause. TEX.PEN.CODE ANN. § 19.02(d). When an appellant asserts that there is no evidence to support an adverse finding on which he had the burden of proof, as Appellant does here, we construe this issue as an assertion that the contrary was established as a matter of law.

In reviewing the legal sufficiency of the evidence to support an adverse finding on the affirmative defense of sudden passion, we look for evidence ("more than a mere scintilla")[2] that supports the jury's implied finding that Appellant that did not act in sudden passion, and we disregard all evidence of Appellant's acts that support his sudden passion claim unless a reasonable fact finder could not disregard that evidence. *Matlock v. State*, 392 S.W.3d 662, 669 (Tex.Crim.App. 2013). If no evidence supports the jury's finding that Appellant did not act under sudden passion, then we search the record to see if Appellant had established, as a matter of law, that he caused the death of Baker under the immediate influence of sudden passion arising from an adequate cause. *Id.* at 669-70. If the record reveals evidence supporting the defendant's position that he acted under sudden passion, but that evidence was subject to a credibility determination that a reasonable jury was entitled to disbelieve, we will not consider

---

[2] "Evidence does not exceed a scintilla if it is 'so weak as to do no more than create a mere surmise or suspicion' that the fact exists." *In re Estate of Campbell*, 343 S.W.3d 899, 904 n.6 (Tex.App.--Amarillo 2011, no pet.), *quoting Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

15

that evidence in our matter-of-law assessment. *Id.* at 670.

Only if the appealing party establishes that the evidence conclusively proves his affirmative defense and "that no reasonable jury was free to think otherwise," may the reviewing court conclude that the evidence is legally insufficient to support the jury's rejection of Appellant's affirmative defense. *Id.*, *quoting Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009). Applying this standard to criminal cases, the *Matlock* court concluded that an appellant is entitled to an acquittal on appeal despite the jury's adverse finding on his affirmative defense only if the evidence conclusively establishes his affirmative defense under the modified two-step *Sterner* test discussed above. *Id.* at 670.

## Factual Sufficiency Standard

A criminal defendant may also raise a factual-sufficiency challenge to the jury's adverse finding on his affirmative defense.[3] In that event, we, as the reviewing court, turn to *Meraz v. State*, 785 S.W.2d 146, 147 (Tex.Crim.App. 1990), the seminal case on factual sufficiency, in which the defendant claimed that the jury's rejection of his incompetency plea--a plea that he had the burden to prove and thus is similar to an affirmative defense--was against the great weight of the evidence. In *Meraz*, the Court of Criminal Appeals adopted the civil standard of factual sufficiency review because the burden of proof is that of "preponderance of the evidence," the same burden as in civil proceedings. *Id.* at 153-55; *Matlock*, 392 S.W.3d at 671. When the defendant makes a factual sufficiency claim, he is asserting that, considering the entire body of evidence, the jury's rejection of his affirmative defense was so "against the great weight

---

[3] As the *Matlock* court discussed, technically, a defendant's claim is not one of "factual insufficiency." He is really arguing that he had offered so much evidence in support of his affirmative defense claim and the State offered so little evidence rebutting his defense, that the jury's rejection of his affirmative defense is against the great weight and preponderance of the evidence. *See Stone v. State,* 823 S.W.2d 375, 380-81 (Tex.App.--Austin 1992, pet. ref'd). The defendant is claiming that his evidence is more than sufficient to support his affirmative defense, while the State's evidence is insufficient to rebut it. *See Matlock*, 392 S.W.3d at 670 n.29.

16

and preponderance" of that evidence to be manifestly unjust. *Matlock*, 392 S.W.3d at 671; *Meraz*, 785 S.W.2d at 154-55.

In the factual sufficiency review of a rejected affirmative defense, sudden passion in this instance, we view the entirety of the evidence in a neutral light, but we may not usurp the function of the jury by substituting its judgment in place of the jury's assessment of the weight and credibility of the witnesses' testimony. *Matlock*, 392 S.W.3d at 671. Therefore, we may sustain Appellant's factual sufficiency claim only if, after setting out all the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, we clearly state why the verdict is so much against the great weight of the evidence so as to be manifestly unjust, conscience-shocking, or clearly biased. *Id.*

We find *Lewis v. State*, 231 S.W. 113 (Tex.Crim.App. 1921) and *Moore v. State*, 969 S.W.2d 4 (Tex.Crim.App. 1998), to be instructive in this instance. The *Lewis* and *Moore* courts illustrate how difficult it is to distinguish between evidence raising self-defense and evidence that raises sudden passion. *Benavides v. State*, 992 S.W.2d 511, 524-25 (Tex.App.--Houston [1st Dist.] 1999, pet. ref'd). It would be a rare instance when issues of self-defense do not also raise issues of sudden passion. *Id.* at 525. Accordingly, then, except in rare instances, the same evidence that is sufficient to overcome a self-defense claim will also be sufficient to overcome a sudden-passion claim. *Id.*; *see also Aflred v. State*, No. 06-99-00084-CR, 2000 WL 1356774, at *9 (Tex.App.--Texarkana Sept. 21, 2000, pet. ref'd)(not designated for publication); *Chavez v. State*, 6 S.W.3d 56, 65 (Tex.App.--San Antonio 1999, pet. ref'd). Thus, the substantial amount of evidence that we discussed with regard to the first point of error would also justify a finding that Appellant was not acting under sudden passion. "Resolution of such a question is uniquely the province of the fact finder." *Gold v. State*, 736 S.W.2d 685, 690 (Tex.Crim.App. 1987),

17

*overruled on other grounds by Torres v. State*, 785 S.W.2d 824, 825 (Tex.Crim.App. 1990). Accordingly, after viewing the entirety of the evidence, we overrule Appellant's second and third issues.

### CHARGE ERROR

In his fourth and final point of error, Appellant contends that the trial court committed egregious error by including an instruction in the punishment charge as to good conduct time because Appellant was not eligible for same due to the deadly weapon finding.

Our first duty in analyzing a charge issue is to examine whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex.Crim.App. 2005); *Middleton v. State*, 125 S.W.3d 450, 453 (Tex.Crim.App. 2003), *citing Hutch v. State*, 922 S.W.2d 166, 170-71 (Tex.Crim.App. 1996). If we find error, then we analyze that error for harm. *Ngo*, 175 S.W.3d at 743. Preservation of error is not an issue until harm is assessed. *Id.* The degree of harm necessary for reversal depends on whether Appellant preserved the error by objection. *Id.* Under *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984), charge error requires reversal when the defendant properly objects to the charge and we find "some harm" to his rights. *See also Hutch*, 922 S.W.2d at 171. However, when the defendant fails to object or states that he has no objection, we will not reverse for charge error unless the record shows "egregious harm" to the defendant. *Ngo*, 175 S.W.3d at 743; *Bluitt v. State*, 137 S.W.3d 51, 53 (Tex.Crim.App. 2004); *Almanza*, 686 S.W.2d at 171. In assessing the degree of harm, we do so in light of the entire jury charge, the state of the evidence, the argument of counsel, and any other relevant information in the record as a whole. *Almanza*, 686 S.W.2d at 171.

At issue here is the trial court's inclusion of Article 37.07, section 4(a), in the jury charge. The Texas Legislature enacted legislation that requires the trial judge to instruct the jury in the

18

precise wording that the statute recites. *Luquis v. State*, 72 S.W.3d 355, 363 (Tex.Crim.App. 2002). Article 37.07, section 4(a), lays out, verbatim, the exact words that the trial judge is required to use. *Id.* There are even quotation marks around the wording of the instruction. *Id.* We agree that "[t]hat is at least some indication that the Legislature did not want any creative deviations from its chosen language." *Id.* The Legislature further prefaced its instruction language with directions that "the court shall charge the jury in writing as follows: . . . ." *Id.* Typically, the use of the word "shall" indicates a mandatory duty.[4]

Trial judges are faced with a dilemma. If they do not give the statutorily mandated instruction, they violate the statute. *Id.*; *see also* TEX.CODE CRIM.PROC.ANN. art. 36.14 (West 2015)(explaining how trial judges are required to deliver to the jury "a written charge distinctly setting forth the law applicable to the case"). If they do not give these instructions, defendants, like Appellant in this instance, may claim that portions of the instruction might be misleading and inapplicable to them. *Luquis*, 72 S.W.3d at 363. While a trial judge may occasionally doubt the wisdom of a particular law, he is still not free to ignore the explicit legislative directions unless those directives are clearly unconstitutional. *Id.* Thus, because the trial court here instructed the jury according to the legislative dictate expressed in Article 37.07, section 4(a), it did not err. We overrule Issue Four and affirm the judgment of the trial court below.

---

[4] *See Waythe v. State*, 533 S.W.2d 802, 804 (Tex.Crim.App. 1976)(stating that the term "shall" is usually mandatory when used in statutes, unless legislative intent suggests otherwise); *Brinkley v. State*, 320 S.W.2d 855, 856 (Tex.Crim.App. 1958)("'Must' and 'shall' are synonymous and are usually mandatory when used in statutes"); *Sodipo v. State*, 815 S.W.2d 551, 554 (Tex.Crim.App. 1990), *citing Brinkley* for the proposition that "must and "shall" generally mean a mandatory statute; "[a]lthough the term 'shall' may sometimes be construed to be permissive or directory, we understand the rule to be that 'shall' should be given the meaning that best expresses the legislative intent."

August 31, 2016

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.

(Do Not Publish)